[No. 30070. Department One. March 13, 1947.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD BRITTON, *Appellant.*[1]

[1]Reported in 178 P. (2d) 341.

*Monheimer, Schermer & Mifflin,* for appellant.

*Lloyd Shorett* and *Max R. Nicolai,* for respondent.

SCHWELLENBACH, J.—The defendant was charged, in an amended information, with the crime of first-degree murder, as follows:

"He, the said RICHARD BRITTON, in company with another person who has not been apprehended, in the County of King, State of Washington, on or about the 13th day of December, 1945, while then and there, wilfully, unlawfully and feloniously engaged in committing, attempting to commit or in withdrawing from the scene of the commission of a Robbery, wilfully, unlawfully and feloniously did shoot at, toward and into the body of one Clayton Stockberger, a human being, with a certain deadly weapon, to-wit: a shotgun, then and there had and held by said person who has not been apprehended, thereby mortally wounding the said Clayton Stockberger, from which wounds the said Clayton Stockberger then and there died;

"Contrary to the statute in such case made and provided, and against the peace and dignity of the State of Washington."

Upon a trial, the jury returned a verdict of first-degree murder, as charged. From judgment and sentence entered on the verdict, the defendant has appealed.

The Florsheim Shoe Store is located on the northwesterly corner of Second avenue and Marion street, in the city of Seattle, with the entrance on Second avenue. The room is twenty by forty feet and contains the usual chairs, tables, display counters, shelves, and show cases found in a shoe store. On the afternoon of December 13, 1945, at about four-thirty o'clock, Mr. Clayton Stockberger, the manager, and a clerk were busy waiting on customers. A man came in, and was measured for a pair of shoes by the clerk. Then another man armed with a shotgun entered. One of the two said, " 'It is a stickup. I want your money.' " The one with the shotgun fired at Mr. Stockberger, who was standing at the back cash desk, killing him instantly. The two men then fled from the store and down the hill on Marion street towards First avenue. Shortly thereafter, when the police arrived, they found a hat and a jacket on a parking meter located just east of the alley on Columbia street, between Second and First. The hat was later identified as the appellant's and the jacket as belonging to his brother Homer.

The next day, at the police station, a woman customer who had witnessed the holdup and murder picked out from the mug book the appellant as one of the bandits. Later, she pointed him out in a line-up at the police station. Of six people who saw the two men at the scene of the crime that afternoon, four of them pointed out the appellant in the line-up. He was identified as having participated in the crime, but not as the man who fired the shot.

The appellant lived in the Lakewood housing project, out from White Center, with his wife and child and his brother Homer. He and Homer did not return home the night before the holdup. Between eleven and twelve on the morning of the day in question, the two brothers went to their home with a third man, whom they did not introduce to Mrs. Britton or to another woman who was staying with the Brittons. They were there about twenty minutes and then left, the third man wearing Homer's coat and carrying appellant's hat in his hand. Appellant and Homer came back that evening between five and six. Mrs. Britton was not there when they arrived, she having taken their car to a garage for repairs. Upon her return, the men wanted the car, so Homer and Mrs. Britton went to the garage for it. About seven o'clock that evening, the men left, and Mrs. Britton did not see them again until they were brought back under arrest.

The night of the holdup and murder, the men started for Texas. They drove directly to Ellensburg, where they stayed a couple of days. Their next stop, for three or four days, was at Hagerman, Idaho, because they had wrecked their car and it was laid up for repairs. They registered at a hotel under assumed names and gave fictitious addresses. Outside of this fact, there was no evidence that they had attempted to keep under cover.

They arrived at Van Alstyne, Texas, two days or so before Christmas, and stayed with their parents until December 27th, when they were picked up on the holdup and murder charge. The brothers waived extradition and were brought back to Seattle. Originally, appellant and Homer were charged jointly. The charge against Homer was

later dismissed, and he was called by the state as a witness in this case.

At the trial, appellant testified that, on the afternoon of December 13th, he and his brother had driven with two men, whom he did not know, to White Center. Arriving there, he and Homer got out of the car and spent the afternoon drinking together in two beer parlors. At four-fifteen or four-thirty-five, they caught a bus home. He denied that he had ever been near the Florsheim Shoe Store, and said that he did not know about the holdup or murder until he read about it in the newspapers.

Error is assigned upon the giving of certain instructions, the refusal to give others, and upon the entry of an order overruling appellant's objection to the entry of judgment and sentence by Judge Matthew W. Hill.

Homer Britton was called as a witness for the state, but refused to answer practically all questions on the ground that such answers would tend to incriminate him.

Appellant proposed the following instruction, designated as defendant's requested instruction No. 1:

"In this case one of the witnesses, Homer Britton, refused to answer a number of questions upon the ground that to so answer would tend to incriminate and degrade him.

"You are instructed that the files and records in this case disclose that Homer Britton was previously charged jointly with Richard Britton, and was subsequently dismissed. The law of this State would permit his subsequent prosecution for the same crime and, therefore, he was perfectly within his legal rights in refusing to answer the questions put to him. You are to draw no inference of guilt of the defendant, Richard Britton, by reason of the failure or refusal of the witness, Homer Britton, to answer any questions under his claim of privilege."

The instruction was refused, and the court gave in its stead instruction No. 18:

"In this case one of the witnesses, Homer Britton, refused to answer a number of questions upon the ground that to so answer would tend to incriminate and degrade him.

"You are instructed that he was entirely within his legal rights in claiming this privilege."

The privilege to refuse to testify on the ground that such testimony would tend to incriminate him, belongs exclusively to the witness and cannot be taken advantage of by the defendant. There was no error in giving instruction No. 18 or in refusing to give appellant's requested instruction No. 1.

 The trial court gave instruction No. 9, as follows:

"Every killing of a human being is presumed in law to be without excuse or justification. Any matter of excuse or justification that may exist for such killing, if such killing you find to be a fact, is matter of defense and the State is not required to prove to you affirmatively that no such excuse or justification existed. It is required, however, that you be convinced, from all the facts and circumstances surrounding the transaction, beyond a reasonable doubt, that such killing was without excuse or justification."

There was not one word of testimony in the record concerning excuse or justification for the killing, and the instruction was clearly erroneous. When the record discloses an error in an instruction given on behalf of the party in whose favor the verdict was returned, the error is presumed to have been prejudicial, and to furnish ground for reversal, unless it affirmatively appears that it was harmless. 3 Am. Jur. 511, § 949. However, it becomes our duty, whenever such a question is raised, to scrutinize the entire record in each particular case, and determine whether or not the error was harmless or prejudicial.

 A harmless error is an error which is trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case. Rem. Rev. Stat., § 307 [P.P.C. § 84-13], provides:

"The court shall, in every stage of an action, disregard any error or defect in pleadings or proceedings which shall not affect the substantial rights of the adverse party, and no judgment shall be reversed or affected by reason of such error or defect."

 A prejudicial error is an error which affected the final result of the case and was prejudicial to a substantial right of the party assigning it. 3 Am. Jur. 555, § 1003, states:

"It is a fundamental rule of modern appellate procedure that in order to warrant a reversal, the error complained of must have been prejudicial to the substantial rights of the appellant or plaintiff in error."

A common test to determine whether an error was harmless or prejudicial, is found in 3 Am. Jur. 563, § 1007:

"One very common test which is applied in a variety of situations is whether or not the error affected the result. If it did not, then it is not reversible error.

"For the purpose of determining whether or not the appellant has been injured, it is proper to look to the whole record, and not to that part only which precedes and includes the particular exception under consideration."

Can it be said that instruction No. 9 influenced the jury? Here was the situation confronting them: Two men came into the shoe store for the purpose of robbery. One of them had a shotgun, and killed a man. Four witnesses identified the appellant as being one of the bandits. He testified that he was not there; that he was in another part of the city all afternoon drinking beer. There was just one question for the jury to determine: Was he or was he not one of the bandits? At the beginning of the trial, objection was made by appellant's counsel to the introduction in evidence of pictures taken of the deceased. He stated:

"We do not contend or contest it in any manner that Mr. Stockberger was killed as the result of a holdup. The only question in this case is whether this defendant is the man who did it."

A careful reading of the entire record convinces us that the giving of instruction No. 9 was not prejudicial to the appellant.

This case went to trial on June 3, 1946, in the superior court for King county, before the Honorable Matthew W. Hill, one of the judges of that court, sitting in Department No. 1 thereof. It continued through June 6th, when the jury returned a verdict of guilty. A motion for a new trial was filed June 8th. On June 28th, appellant filed an objection to the signing of the judgment and sentence by Judge Hill, on the ground that his appointment was invalid and an unconstitutional act.

Art. IV, § 8, of the state constitution provides:

"Any judicial officer who shall absent himself from the state for more than sixty consecutive days shall be deemed to have forfeited his office: Provided, that in cases of extreme necessity the governor may extend the leave of absence such time as the necessity therefor shall exist."

In 1941, the legislature adopted chapter 201, p. 592 for the protection of persons in the military and naval service of the United States. Section 2, p. 593 (Rem. Supp. 1941, § 10758-4 [P.P.C. § 746r-3]), of that act provides:

"When any elective officer of this state or any political subdivision thereof, including any judicial officer, shall be ordered into active service as provided in the foregoing section, he shall be deemed to have been granted leave of absence for such period of service. In the case of any judicial officer, such order to active service shall be deemed to create a case of extreme necessity and the Governor shall extend the leave of absence to cover the period of such active service. No leave of absence provided for herein shall operate to extend the term for which the occupant of any elective position shall have been elected. During such leave of absence the position of any elective official may be filled temporarily by an appointment to be made by the officer, board or other agency which would be authorized to fill a vacancy created by the death or resignation of the elective official so ordered to such service."

The records in the office of the secretary of state show the following: The Honorable Malcolm Douglas, the duly elected, qualified, and acting judge of the superior court for King county, Department No. 1, applied for, and was granted, on January 5, 1942, a military leave of absence. He was re-elected in November, 1944, for a term of four years commencing January 8, 1945, and filed his oath of office December 18, 1944. On December 28, 1944, Governor Arthur B. Langlie appointed the Honorable Matthew W. Hill to fill the position temporarily, and he qualified the same day. January 8, 1945, upon request, Governor Langlie extended Judge Douglas' military leave of absence. On the day of such extension, Governor Langlie appointed Judge Hill to fill the position temporarily, and he immediately filed his oath of office.

■■ Under the constitutional provision, the governor had the right to extend the leave of absence granted to Judge Douglas for the full term of the emergency. We do not feel called upon to determine the constitutionality of chapter 201 of the session laws of 1941 in this proceeding. Judge Hill was appointed by Governor Langlie, and he held the position from December 28, 1944, through June 28, 1946. He held it by virtue of his appointment. There can be no question but that he was a *de facto* judge.

"A judge de facto is one acting with color of right and who is regarded as, and has the reputation of, exercising the judicial function he assumes; . . .

"A judge who actively assumes the duties of his office after he has been appointed by the governor of the state, or has been elected by the people, is at least a de facto judge even though facts aliunde might disclose irregularities in the appointment or the election." 48 C. J. S. 949, § 2 (2).

In *Hamlin v. Kassafer,* 15 Ore. 456, 15 Pac. 778, 3 Am. St. 176, Judge Foudroy had been elected a justice of the peace at the general election in 1884, and entered upon the discharge of his duties. At the general election in 1886, he was again a candidate, but was defeated by one Hubbel, who received a certificate of election, and qualified. Hubbel demanded possession of the office and its docket and books thereunto belonging, but Foudroy refused to deliver them and continued to exercise and perform the functions of the office. Hubbel performed the duties and functions of a justice of the peace, but these acts were performed in his official capacity as city recorder, by virtue of which he was *ex officio* justice of the peace. In an appeal attacking the validity of a judgment entered by Foudroy, the court held, p. 458:

"It is admitted, therefore, that this record presents only one question, was Foudroy a *de facto* officer? Upon this point there would seem to be little room for controversy, for conceding, as was argued, that Hubbel, by reason of official duties performed at the town hall, was reputed to be a justice of the peace, it by no means follows that these facts operated to displace Foudroy, and induct *him* into the possession of the disputed office. To render the judgment void,

Foudroy must have presumed to act without any just pretense or color of title. As this is the contention of counsel for the plaintiff, it may not be amiss to note, preliminarily, some distinctions as to officers, which will render the law applicable to the facts in hand more evident.

"An office has been defined to be a right to exercise a public function or employment, and to take the fees and emoluments belonging to it, and Chief Justice Marshall says: 'He who performs the duties of that office is an officer.' From the inherent nature of an office, no less than from reasons of public policy, there cannot be two persons in the possession of an office at the same time. It becomes important, then, to observe the distinction between an officer *de jure* and an officer *de facto*. Lord Ellensborough said: 'One who has the reputation of being the officer he assumed to be, and yet is not a good officer in point of law, is an officer *de facto*.' (*King* v. *Bedford Level*, 6 East, 356.) To constitute a person an officer *de facto*, he must be in the actual possession of the office, and in the exercise of its functions and in the discharge of its duties. When this is the fact necessarily, there can be no other incumbent of the office. An officer *de jure* is one who has the lawful right to the office, but who has either been ousted from, or never actually taken possession of the office. When the officer *de jure* is also the officer *de facto*, the lawful title and possession is united; then no other person can be an officer *de facto* for that office. 'Two persons cannot be officers *de facto* for the same office at the same time.' (*McCahon v. Commrs.*, 3 Kan. 442; *Boardman v. Halliday*, 10 Paige, 232; *Morgan v. Quackenbush*, 22 Barb. 80.) 'An officer *de facto*,' said Storrs, J., 'is one who exercises the duties of an office, under color of an appointment or election to that office. He differs, on the one hand, from a mere usurper of an office, who undertakes to act as an officer without any color of right; and on the other hand, from an officer *de jure*, who is, in all respects, legally appointed and qualified to exercise the office. It is not in all cases easy to determine what ought to be considered as constituting a colorable right to an office, so as to determine whether one is a mere usurper.' (*Plymouth* v. *Painter*, 17 Conn. 588.) The distinction, then, which the law recognizes, is that an officer *de jure* is one who has the lawful right or title, without the possession of the office, while an officer *de facto* has the possession and performs the duties under the color of right, without being actually qualified in law so to act, both being distinguished from the mere usurper, who has neither lawful title nor

color of right. The mere claim to be a public officer is not enough to constitute one an officer *de facto*. There must be some color to the claim of right to the office, or without such color, a performance of official duties, with the acquiescence of the public, for such a length of time as to raise a presumption of colorable right. [Citing authorities.]"

No vacancy existed in the office of the judge of the superior court for King county, in Department No. 1, by virtue of a leave of absence having been granted Judge Douglas during an emergency. He was entitled to the possession of the office upon his return. But at the time of the trial, Judge Douglas was not in possession of the office—he was not even in this state. During the interim, while he was in the armed forces—while he was under the jurisdiction of the army—until he received his discharge, he could not have exercised his judicial functions. Judge Hill was in possession of the office by virtue of his appointment by the governor. He was not a mere usurper or interloper undertaking to act without any color of right. He was a *de facto* judge.

"An officer *de facto* must be submitted to as such until displaced by a regular direct proceeding for that purpose; *Ex parte Moore,* 62 Ala. 471; 4 East 327; *Buncombe Turnpike Co. v. McCarson,* 18 N. C. 306; he is a legal officer until ousted; *Board of Auditors of Wayne County v. Benoit,* 20 Mich. 176, 4 Am. Rep. 382." 1 Bouvier's Law Dictionary (Rawle's 3d rev.) 761.

We find no reversible error appearing in the trial, and the judgment and sentence is affirmed.

MALLERY, C. J., MILLARD, STEINERT, and SIMPSON, JJ., concur.

April 30, 1947. Petition for rehearing denied.