[No. 48148-2.   En Banc.   September 9, 1982.]

*In the Matter of the Personal Restraint of*
DAVID F. HAGLER, ET AL, *Petitioners.*

*John Midgley of Evergreen Legal Services,* for petitioners.

*David Bruneau, Prosecuting Attorney for Clallam County, Don Herron, Prosecuting Attorney for Pierce County,* and *Michael R. Johnson, Deputy,* for respondent.

PEARSON, J.—Two personal restraint petitions have been consolidated for this appeal. John Wesley Polk attacks his conviction of first degree murder; David Fred Hagler attacks his conviction of second degree murder. Both petitioners claim that a jury instruction found unconstitutional after their convictions became final impaired their right to a fair trial.

The instruction complained of is one which at the time of petitioners' trials was standard in this state: "The law presumes that every man intends the natural and probable

consequences of his own acts".

On June 18, 1979, the United States Supreme Court held that an instruction similar to this was unconstitutional. *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). On October 23, 1980, this court followed *Sandstrom* and declared unconstitutional an instruction essentially identical to the one above. *State v. Caldwell,* 94 Wn.2d 614, 618 P.2d 508 (1980). Petitioners argue that *Sandstrom* and *Caldwell* should be given retroactive effect, and that consequently petitioners are entitled to new trials.

We find it unnecessary to reach these contentions. We hold that in a collateral attack upon a conviction by way of a personal restraint petition, a petitioner must show that he was prejudiced by the alleged error of the trial court. No such prejudice can be shown by either petitioner. Even if we assume that it was error for the challenged instructions to be given, our review of the records satisfies us that neither petitioner was prejudiced by that assumed error. Both petitions are therefore dismissed.

Petitioner Polk was convicted on July 27, 1977, in Pierce County Superior Court of first degree murder of one William Sloan. He was sentenced to life imprisonment. He appealed, challenging the admissibility of certain testimony introduced to show premeditation, the inflammatory nature of the prosecutor's remarks during closing arguments, and the constitutionality of a jury instruction on the presumption of intent which had not been challenged at trial. The Court of Appeals affirmed his conviction on April 23, 1979. On June 18, 1979, *Sandstrom* was decided, and on October 23, 1980, *Caldwell* was decided.

On December 30, 1980, petitioner renewed his challenge to the presumption of intent instruction in a personal restraint petition filed in the Court of Appeals. The petition was certified to this court and consolidated with the petition of David F. Hagler.

Petitioner Hagler was convicted in Clallam County Superior Court on October 5, 1976, of second degree murder. No appeal was taken from this conviction, but on

October 10, 1977, Hagler filed a personal restraint petition in the Court of Appeals. One issue raised in this petition was remanded for an evidentiary hearing; the Superior Court dismissed the issue, the Court of Appeals affirmed the dismissal, and this court denied review. Hagler filed a second personal restraint petition and for the first time raised the issue that the presumption of intent instruction was unconstitutional. The Court of Appeals dismissed the petition and this court denied review. Hagler's third petition was filed in the Court of Appeals on November 30, 1978, and dismissed on May 1, 1979. This petition is Hagler's fourth. It was filed in the Court of Appeals on December 17, 1980, and certified to this court.

Resolution of these two cases requires a consideration of the facts presented to the jury about the two murders and the issues contested at the trial.

Petitioner Polk was convicted of the murder of William Sloan in a Tacoma tavern. Witnesses testified that Polk entered the tavern and walked directly up to Sloan, who was playing pool. Polk greeted Sloan and then grabbed him by the collar and struck him several times. Five witnesses saw Sloan fall to the floor as Polk released him. Polk stepped over Sloan's prostrate body and left the tavern through a back door. Sloan remained on the floor in a pool of blood, unable to move. His spinal cord had been severed, and his right lung punctured. Three days later he expired from these wounds. One witness testified that she saw an object, which might have been a knife, in Polk's fist as he struck Sloan. No other witness saw Polk wield a knife, and no knife was produced at the trial.

Polk denied that he stabbed Sloan. He testified that Sloan hit him with a pool cue and that he, Polk, retaliated by hitting Sloan with his fist. The blow felled Sloan, and Polk left the tavern through the front door. As he left, Polk saw four men grab Sloan. Polk said he had seen these men buy drugs from Sloan earlier in the evening. The jury obviously did not believe Polk's version, and Polk was convicted of first degree murder.

Petitioner Hagler was convicted of the murder of Leif Eric Ellington. The evidence against him was circumstantial and Hagler's defense was alibi. The victim Ellington was found at 10 a.m. January 9, 1976, shot to death in his trailer home near Port Angeles. There were .38 caliber bullet wounds in his head and abdomen. Medical evidence established that death occurred some time after the early morning of January 8, 1976. A neighbor of the victim testified to hearing a volley of four gunshots at some time between 5:15 and 5:30 p.m. on January 8.

In early May 1976, a .38 caliber Smith & Wesson pistol was found by young men diving in a river not far from Port Angeles. Expert witnesses testified that the pistol had been in the river from 4 to 8 months and that slugs found in the victim's body had been fired from the pistol. Records of a gun shop in Port Angeles indicated that the pistol had been sold in May 1969 to one David Lee Douglas. David F. Hagler, the petitioner, had used the name David Lee Douglas since 1966.

Hagler became acquainted with Ellington in the early 1970's. Ellington was somewhat eccentric, preferring to live in a small, run–down trailer, although he owned a house and several parcels of real property. He professed an abhorrence of paying taxes on his properties. One day in 1975, Hagler pointed out to him an article in a tabloid newspaper which discussed the tax–exempt status of churches. Subsequently, the two men applied to the world headquarters of the Science of Life Church in Florida and obtained a charter which authorized them to establish a branch of the church. Ellington had his attorney set up the Science of Life Church of Port Angeles, and turned over 11 parcels of real estate to the church. Hagler was appointed president, his wife secretary, and Ellington vice–president of the church. Although there was testimony that a religious impulse contributed to the establishment of the church, testimony also suggested that these religious convictions were supported by a desire to shelter the property from taxation and a threatened lawsuit.

Testimony crucial to the prosecution's case came from the Niningers, a couple who were involved in business transactions with the church and who were acquainted with Hagler and Ellington. Terry Nininger had been negotiating the purchase of 30 acres of property from the church. He testified that on January 8, around noon, he passed Hagler and Ellington, who were driving toward Port Angeles in Hagler's car. That was the last time he saw Ellington. He next saw Hagler when Hagler arrived at the Nininger residence at around 5:30 p.m. that evening. Paula Nininger, Terry's wife, testified that Hagler and Ellington stopped briefly at her house at around noon. She never saw Ellington again. She next saw Hagler when he returned to the house some time between 5 and 6 p.m. that same evening.

Both Mr. and Mrs. Nininger had initially told police officers investigating Ellington's death that Hagler had returned to their house at 3 p.m. They testified at the trial that this statement had been false, and that it had been made in response to a request from Hagler that they tell the police that he arrived at the earlier hour.

Hagler testified that he did not shoot Ellington. He did not deny that the pistol used to kill Ellington had belonged to him, but said that it had been lost several years earlier. On the day of the killing, he had taken Ellington to his house trailer after leaving the Nininger's house. After he left Ellington at 1:30 p.m., he paid a 30–minute call on his father–in–law. He next stopped at a liquor store for some whiskey and visited an elderly man of his acquaintance. After leaving this man's home, Hagler stopped at a grocery store for some tobacco and drove to the Nininger house, arriving between 4:30 and 5 p.m.

Hagler was charged with first degree murder. The jury found him guilty of second degree murder.

Both petitioners argue that the presumed intent instruction used in their trials was improper. Both men were convicted several years ago and direct appeal on this issue is not now available to them. Instead, they assert their claim of error by way of personal restraint petitions. Therefore, it

is necessary for us to consider the standards of review appropriate to a collateral attack on jury instructions.

It is well established that on direct appeal improper instructions are presumed to be prejudicial and furnish grounds for reversal.

> When the record discloses an error in an instruction given on behalf of the party in whose favor the verdict was returned, the error is presumed to have been prejudicial, and to furnish ground for reversal, unless it affirmatively appears that it was harmless.

*State v. Golladay,* 78 Wn.2d 121, 139, 470 P.2d 191 (1970), quoting *State v. Britton,* 27 Wn.2d 336, 341, 178 P.2d 341 (1947). *See also State v. Rotunno,* 95 Wn.2d 931, 935, 631 P.2d 951 (1981). While the presumption of prejudice is appropriate to direct review of a conviction, it is not appropriate to collateral review by way of personal restraint petition.

Personal restraint procedure has its origins in the State's habeas corpus remedy, guaranteed by article 4, section 4 of the state constitution. Prior to 1947, decisional law limited postconviction relief by petition for writ of habeas corpus to cases where the judgment and sentence could be said to be void on their face. But in 1947 the Legislature amended RCW 7.36.130(1) in an attempt to expand postconviction relief. This resulted in the development on a case–by–case basis of a somewhat haphazard habeas corpus procedure. In an effort to achieve a unified, systematic and expeditious procedure for postconviction relief, this court promulgated CrR 7.7, effective July 1973. *See Holt v. Morris,* 84 Wn.2d 841, 843–44, 529 P.2d 1081 (1974). Three years later, the rule was reformulated in RAP 16.3–16.15 to provide for postconviction relief by personal restraint petition. *In re Myers,* 91 Wn.2d 120, 121 n.1, 587 P.2d 532 (1978).

Fundamental to the nature of habeas corpus relief is the principle that the writ will not serve as a substitute for appeal. This was crystal clear prior to the 1947 amendment of RCW 7.36.130(1). This court stated in *In re Grieve,* 22 Wn.2d 902, 904, 158 P.2d 73 (1945) that "the writ of *habeas*

*corpus* cannot be used as a medium to review trial errors". After *Grieve* the scope of the writ was broadened to provide a medium for collateral attack on trial errors, and habeas corpus procedure became personal restraint procedure. But the fundamental principle survived this broadening of scope and change in nomenclature. A personal restraint petition, like a petition for a writ of habeas corpus, is not a substitute for an appeal. *In re Myers, supra.*

The United States Supreme Court has unmistakably affirmed this principle in the federal context in recent decisions reviewing collateral challenges to criminal convictions brought under 28 U.S.C. § 2255 (1976).

> When Congress enacted § 2255 in 1948, it simplified the procedure for making a collateral attack on a final judgment entered in a federal criminal case, but it did not purport to modify the basic distinction between direct review and collateral review. It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice.

(Footnotes omitted.) *United States v. Addonizio,* 442 U.S. 178, 184, 60 L. Ed. 2d 805, 99 S. Ct. 2235 (1979), quoted in *United States v. Frady,* 456 U.S. 152, 71 L. Ed. 2d 816, 102 S. Ct. 1584, 1593 (1982).

The well known and basic reasons for limiting collateral attack alluded to in this passage are as relevant to our state personal restraint petition proceedings as to federal section 2255 proceedings. These reasons were discussed by the United States Supreme Court in *Engle v. Isaac,* 456 U.S. 107, 71 L. Ed. 2d 783, 102 S. Ct. 1558 (1982). Collateral relief undermines the principles of finality of litigation, degrades the prominence of the trial, and sometimes costs society the right to punish admitted offenders. *Engle v. Isaac, supra.* These are significant costs and they require that collateral relief be limited in state as well as federal courts.

Federal courts place the burden on the petitioner of showing that an erroneous instruction was so prejudicial that it will support a collateral attack on a trial court's judgment. *Henderson v. Kibbe,* 431 U.S. 145, 155, 52 L. Ed. 2d 203, 97 S. Ct. 1730 (1977). More recently, the test has been framed thus:

[The petitioner] must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

*United States v. Frady,* 102 S. Ct. at 1596. This burden is a manifestation of the federal courts' recognition of the need to limit collateral attacks on convictions.

The need to limit collateral attack in state proceedings compels us to hold that the same burden should be met in personal restraint petitions. Accordingly, we hold that petitioners in this case must show that the presumption of intent instruction actually worked to their substantial disadvantage in their trials. Although we do not limit our holding that the petitioner must show actual prejudice to petitions raising an issue of retroactivity, we point out that both petitions in this case raise just such an issue. RAP 16.4(c)(4) requires that a petition asserting a change in the law must show that the change is "material to the conviction". Accordingly, we have refused to consider a petition challenging a jury instruction declared improper subsequent to the petitioner's conviction, where the instruction was superfluous. *In re Taylor,* 95 Wn.2d 940, 632 P.2d 56 (1981). The effect of our holding in the present case is to add to that requirement of showing materiality a requirement of showing actual prejudice.

The effect of our holding is essentially to shift one element of the burden of proof onto the petitioner. On direct appeal, the burden is on the State to establish beyond reasonable doubt that any error of constitutional dimensions is harmless. *Chapman v. California,* 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065 (1967); *State v.*

*Evans,* 96 Wn.2d 1, 4, 633 P.2d 83 (1981). On collateral review, we shift the burden to the petitioner to establish that the error was not harmless; in other words, to establish that the error was prejudicial. Whereas the State's burden on direct appeal is beyond reasonable doubt, the petitioner's burden on collateral review should be beyond the balance of probabilities. Thus, in order to prevail in a collateral attack, a petitioner must show that more likely than not he was prejudiced by the error.

Our analysis reflects a response to concerns which have occupied the court on numerous occasions. We have recognized that the writ of habeas corpus cannot be allowed to deteriorate into a writ of appeal allowing a petitioner "to institute appeal upon appeal and review upon review in forum after forum ad infinitum." *Holt v. Morris,* 84 Wn.2d 841, 852, 529 P.2d 1081 (1974) (Hale, C.J., concurring). We have recognized that there must be achieved a balance between the interest in error–free trials and the interest in the finality of judgments. *In re Haynes,* 95 Wn.2d 648, 654, 628 P.2d 809 (1981). We have sought to achieve this balance by means of a procedural screening process whereby errors, constitutional or otherwise, which are not raised on appeal, will not be reviewed in collateral proceedings. *In re Myers,* 91 Wn.2d 120, 587 P.2d 532 (1978); *In re Haynes, supra.* But this rule has proved to be too blunt an instrument for the delicate operation of determining claims which should be given collateral review. We have not been able to apply it consistently. In cases where the interest in finality of judgments was outweighed by the petitioner's interest in having his claim considered, we have reviewed issues not raised on appeal. *In re James,* 96 Wn.2d 847, 640 P.2d 18 (1982); *In re Keene,* 95 Wn.2d 203, 622 P.2d 360 (1980); *In re Schellong,* 94 Wn.2d 314, 616 P.2d 1233 (1980). Moreover, the rule has put us out of step with federal courts and has created the possibility that "our state's personal restraint procedure will come to be viewed as a necessary exhaustion of state remedies, rather than as a method by which serious constitutional claims may be heard". *In re*

*James,* 96 Wn.2d at 856 (Utter, J., concurring).

It may well prove that our insistence on a showing of actual prejudice in personal restraint petitions will be sufficient to achieve the balance we seek between finality of judgments and error–free trials. But we do not decide today to abandon the rule in *Myers.* We specifically leave open the issue of whether we will consider a personal restraint petition in which the petitioner can show he was prejudiced by an error of constitutional dimensions which was not raised on appeal.

Neither petitioner satisfies the burden of showing that he was actually and substantially prejudiced by the instruction that intent could be presumed. Neither petitioner raised lack of intent as a defense at trial. Both petitioners denied committing the assaults which led to the victims' deaths. Nothing in the record of either petitioner's trial suggests that the victims' deaths were unintentional. In Polk's case, the victim died from multiple stab wounds to the upper body. In Hagler's case, the victim died from multiple bullet wounds. We find nothing in either record to suggest that had the instructions been phrased in the manner suggested by *State v. Caldwell,* 94 Wn.2d 614, 618 P.2d 508 (1980), either petitioner would have been acquitted. No actual or substantial prejudice is shown in either petition. Having thus concluded that there is no prejudice in either petition, it is unnecessary for us to consider whether *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979) and *Caldwell* apply retroactively.

Polk also raises issues relating to the lawfulness of his arrest and the sufficiency of the evidence to support his conviction. We find no merit to either issue.

Accordingly, both petitions are denied.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DOLLIVER, WILLIAMS, DORE, and DIMMICK, JJ., concur.

UTTER, J. (concurring)—I concur with the following reservations. I believe the majority by necessity holds *Sand-*

*strom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979) and *State v. Caldwell,* 94 Wn.2d 614, 618 P.2d 508 (1980) should be given retroactive effect. The majority adopts a sweeping new rule in the area of personal restraint petitions. It holds a petitioner must demonstrate prejudice on collateral attack of his conviction. Majority opinion, at 819. The rule is meant to apply to all personal restraint petitions: the majority asserts "we do not limit our holding that the petitioner must show actual prejudice to petitions raising an issue of retroactivity . . ." Majority opinion, at 825. The implications of adopting such a rule in this case cannot be overlooked.

First, by applying its "prejudice" standard as a threshold consideration, the majority purports to avoid addressing the retroactivity of *Sandstrom* and *Caldwell.* I find this failure to address the retroactivity issue unsupportable. The requirement that a change in the law be material to the conviction, RAP 16.4(c)(4), is correctly a threshold question. It establishes the petitioner's standing to raise the claim. *See In re Taylor,* 95 Wn.2d 940, 632 P.2d 56 (1981). Prejudice has no such threshold character. It squarely involves a ruling on the merits. By ruling on the merits that the petitioners were not prejudiced, the majority implicitly finds the holdings in *Sandstrom* and *Caldwell* retroactive. Otherwise, the petitioners would not have anything to be prejudiced by. The majority cannot assume arguendo that which is essential to application of the rule of prejudice.

There is little question the *Sandstrom/Caldwell* rule must be given retroactive application. It is a new rule, the purpose of which is to enhance the truth–finding function of the jury. *See Hankerson v. North Carolina,* 432 U.S. 233, 53 L. Ed. 2d 306, 97 S. Ct. 2339 (1977); *Brown v. Louisiana,* 447 U.S. 323, 65 L. Ed. 2d 159, 100 S. Ct. 2214 (1980); *In re Haverty,* 94 Wn.2d 621, 618 P.2d 1011 (1980). The unconstitutionality of the jury instructions at issue is retroactive. The majority's new rule proceeds to impose the additional requirement of prejudice where a constitutional error such as the *Sandstrom* jury instruction has occurred. The retro-

activity issue is not circumvented by the majority's application of the prejudice standard. It is adopted *sub silentio* through its resolution of the prejudice issue.

Second, the majority's new rule should not be understood as a grave departure from our previous collateral review case law. It has always been the petitioner's burden to prove by fair preponderance of the evidence the basis for his claim. *State v. Angevine,* 62 Wn.2d 980, 984, 385 P.2d 329 (1963). Moreover, the idea that prejudice must be demonstrated is not foreign to standards for collateral review. *See Koehn v. Pinnock,* 80 Wn.2d 338, 342, 494 P.2d 987 (1972) (Finley, J., concurring). But it must be borne in mind that prejudice is not a fixed standard, nor is it a concept altogether appropriate for all claims on collateral review. As Judge Friendly has indicated, the degree of prejudice required varies from case to case:

> The conclusion we draw from all this is that the standard of how serious the probable effect of an act or omission at a criminal trial must be in order to obtain the reversal or, where other requirements are met, the vacating of a sentence, is in some degree a function of the gravity of the act or omission; the strictness of the application of the harmless error standard seems somewhat to vary, and its reciprocal, the required showing of prejudice, to vary inversely, with the degree to which the conduct of the trial has violated basic concepts of fair play. At one end of the range is the case where the defendant has simply, although excusably, not had the benefit of evidence that has later become available to him; there the Berry test [*Berry v. State,* 10 Ga. 511, 527 (1851)] requires a showing that the new evidence "would probably produce a different verdict." At the other end of the range is the case of a defendant being obliged to plead to a capital charge without benefit of counsel; there the court "does not stop to inquire whether prejudice resulted." Hamilton v. State of Alabama, 82 S.Ct. 157, 159 (1961). Between these extremes lie the other cases we have reviewed—newly discovered evidence that a witness has recanted, or had lied (without knowledge by the prosecutor); ordinary errors in the admission or exclusion of evidence; violations of statutory commands; and

infringements of other constitutional guarantees.

The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that "The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach," People v. Savvides [1 N.Y.2d 554, 556, 136 N.E.2d 853, 854, 154 N.Y.S.2d 885 (1956)], and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. See Mapp v. Ohio, 367 U.S. 643, 650–653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In other cases, where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome—an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first.

(Footnote omitted.) *Kyle v. United States,* 297 F.2d 507, 514 (2d Cir. 1961).

Fundamental fairness is the key concern. Where a constitutional error goes to the truth–finding function of the jury we must provide collateral relief where the error might have affected the result in a criminal prosecution. Our concerns for finality of judgments simply have no force where a person who might be innocent is the subject of such finality. Time does not lend credibility to a judgment that is unfair. There is no reason, however, to believe an acquittal might have occurred in the cases before us had the unconstitutional instruction been omitted.

Finally, if the majority's rule is to have value, it must be the *sole* criterion to which we refer in evaluating personal restraint petitions. If it merely imposes an *additional* hurdle to petitioners, it will be exemplary only of the court's

antipathy for personal restraint petitions. The majority's rule has the earmarks of a comprehensive replacement for the procedural bar rule of *In re Myers,* 91 Wn.2d 120, 587 P.2d 532 (1978), a rule the majority labels "too blunt". Majority opinion, at 826. Yet the majority avoids explicitly overturning *Myers.* In *Myers,* the court held:

> we hold that the general rule—*i.e.,* the failure to identify errors at trial or prosecute them on appeal precludes reliance thereon in subsequent proceedings—applies to alleged errors raised for the first time on collateral attack.

91 Wn.2d at 125-26.

Petitioner Hagler did not raise the *Sandstrom/Caldwell* issue on appeal. As the State itself argues, Hagler's case is factually similar to *Myers.* Brief of Respondent, at 20. By reaching the merits of Hagler's claim despite his procedural default, the majority by necessity disapproves of *Myers.*

With the above reservations and qualifications, I concur.

Reconsideration denied November 16, 1982.