# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  46119-6-II |
| Respondent, | |
| v. | |
| CHARLES R. GOTCHER, | Consolidated with |
| Appellant. | |
| In the Matter of the Personal Restraint Petition of | No.  47142-6-II |
| CHARLES R. GOTCHER, | |
| | UNPUBLISHED OPINION |
| Petitioner. | |

WORSWICK, J. — Charles Gotcher appeals his conviction for one count of third degree child molestation and two counts of third degree child rape.  He argues that the trial court (1) denied his right to a public trial by allowing counsel to choose two alternate juror seat numbers in private and (2) abused its discretion by refusing to impose an exceptional sentence downward from the standard range.  In a statement of additional grounds (SAG), Gotcher claims that (3) the victim's testimony was inconsistent with the charging document regarding the offense dates, and (4) the trial court should not have admitted evidence of poems Gotcher wrote to the victim.  Finally, in a personal restraint petition (PRP), Gotcher alleges that (5) the prosecutor withheld favorable evidence—namely, information about an unrelated prosecution of another defendant for raping the same victim.  We disagree, and affirm Gotcher's convictions.  We deny his PRP.

No. 46119-6-II;
Consolidate with No. 47142-6-II

FACTS

AE[1] was born in July 1995. She met Gotcher at church when she was 11 or 12 years old. Gotcher, who was 27 or 28 years old, began to pursue AE romantically. Over the course of their association, he kissed her several times. Gotcher often gave AE alcohol and Vicodin. On several occasions when AE was 14 and 15, Gotcher put his hand in her underwear and touched her on or in her vagina. Another incident occurred during the summer before AE's 16th birthday.[2] During this period, she was spending a lot of time at her sister's house where Gotcher was also living. Gotcher supplied AE with alcohol, and she became very intoxicated. Gotcher had sexual intercourse with AE.

AE had previously been the victim of a sexual assault. In 2010, AE was raped by another man: Jacob Gaiser. Katherine Svoboda, the prosecutor in the instant case, also prosecuted Gaiser.

AE eventually disclosed that Gotcher had raped her. In April 2013, in an effort to gather evidence against Gotcher, AE participated in a phone call with detectives and Gotcher to attempt to solicit an admission from Gotcher.[3] During the phone call, Gotcher asked AE whether she had filed a police report against him. AE responded: "No, I've been refusing. . . . I don't like having

---

[1] We refer to the minor victim using her initials.

[2] AE turned 16 in July 2011.

[3] The jury heard a recording of this phone call during Gotcher's trial.

2

[anything] to do with it. You know about like the whole Jacob Gaiser thing, and everything."

Br. of Resp't (Attachment A). Gotcher did not contradict this statement.

The State charged Gotcher with one count of third degree child molestation[4] and two counts of third degree child rape.[5] The charging information alleged that Gotcher committed the child molestation count "on or between July 26, 2009, and October 31, 2010," the first child rape count on or between "July 26, 2009, and July 25, 2011," and the second child rape count "on or between June 1, 2010 and September 15, 2010." Clerk's Papers (CP) at 1-2. The case proceeded to a jury trial.

Before jury selection began at 9:10 a.m. on the first day of trial, the parties selected two seat numbers of potential jurors to serve as blind alternate jurors. The clerk's minutes from 8:45 a.m. read in part: "Let the Record show: Prior to Court starting both the State and Defense Counsel choose Blind Jurors; Mr. Strophy picked #10 and Ms. Svoboda #8 in that order." Suppl. CP at 25. Thus, counsel for both parties chose two seat numbers of potential jurors who would serve as alternates before the jury had been empaneled and before the jury venire arrived to fill those seats. The record does not show that the courtroom was closed during the selection of alternate juror seat numbers.

The State sought to prove that Gotcher had a lustful disposition towards AE. At the start of trial, the State sought to lay a foundation for several messages it alleged Gotcher wrote to AE;

---

[4] RCW 9A.44.089.

[5] RCW 9A.44.079.

3

these included poems saved on an iPod. Gotcher's counsel stated: "I received copies of these in advance of trial." 2 Verbatim Report of Proceedings (VRP) (Jan. 7, 2014) (Jury Trial) at 3. He objected on the grounds that there was "no indication, other than [Gotcher's] own testimony through the author, who they were intended for," and there was "no chain of custody established." 2 VRP (Jan. 7, 2014) at 3. The trial court reserved ruling on the admissibility of these poems until the State laid a foundation.

At trial, AE testified to the facts described above. She also testified that Gotcher gave her an iPod near the end of 2012. She testified that Gotcher showed her some poems he had written for her on the iPod. AE testified that one of the messages read: "'[AE] and Charles [Gotcher] forever and always.'" 2 VRP (Jan. 7, 2014) at 61. The poems were not admitted into evidence during AE's testimony. Gotcher did not object to AE's testimony about the iPod or the poems.

The following day, the State sought to admit photographs of the poems as exhibits during Detective Darrin Wallace's testimony. The State laid a foundation for their admission through Detective Wallace's testimony of how he received the iPod from AE and then photographed the poems individually. Apparently satisfied by this foundation, Gotcher repeatedly said, "No objection" to the admission of each photo. VRP (Jan. 8, 2014) at 47-50. Accordingly, the trial court admitted each poem.[6] Detective Wallace testified that he had inadvertently changed one of the dates shown on the iPod, but stated he did not alter anything else concerning the poems.

_____

[6] The poems are not in the record before us.

4

No. 46119-6-II;
Consolidate with No. 47142-6-II

The jury convicted Gotcher as charged. At sentencing, Gotcher requested an exceptional sentence downward, arguing that under RCW 9.94A.535(1)(g), the operation of the multiple offense policy of former RCW 9.94A.589 (2002) would result in a presumptive sentence that was clearly excessive. Gotcher also asked the trial court to consider his lack of prior convictions and the amount of support he received from his community.

The trial court considered this request, saying:

> I can conclude that there's always, shall we say, [a] Catch 22 here. And the Catch 22 is the issue of getting treatment . . . . [Y]ou need someone to stand in and say, yep, I did it. I really screwed up. Sorry about that. Not going to do it again. Yeah, I need some treatment. And, therefore, there is no risk of re-offense in the future. . . . And so therefore, I believe, Counsel, [Gotcher] doesn't qualify for this Court to be more lenient than what the standard ranges are, because it's—I'm placed in the position of, I didn't do anything wrong. So, therefore, I'm not entertaining the issue of being more lenient or less stringent in the sentencing of the Court.

VRP (March. 10, 2014) at 9. The trial court also noted that it did not wish to "supplant [its] opinion for that of a jury," and sentenced Gotcher to 45 months on the child molestation count and 46 months on each child rape count, to run concurrently. CP at 18. In its written ruling, trial court said that it did not find any "substantial and compelling" reasons to justify an exceptional sentence above or below this standard range. CP at 7. Gotcher appeals.

ANALYSIS

I. PUBLIC TRIAL

Gotcher argues that the trial court denied his right to a public trial by permitting counsel to select alternate juror seat numbers in private. We disagree.

5

No. 46119-6-II;
Consolidate with No. 47142-6-II

A.      *Standard of Review*

The United States and Washington Constitutions guarantee a defendant the right to a public trial. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. Whether this right was violated is a question of law we review de novo. *State v. Paumier*, 176 Wn.2d 29, 34, 288 P.3d 1126 (2012). We consider whether (1) the trial court closed proceedings to the public, (2) the proceedings implicate the public trial right, and (3) the closure was justified. *State v. Smith*, 181 Wn.2d 508, 513-14, 334 P.3d 1049 (2014). It is the defendant's burden to provide a record that establishes a closure occurred. *State v. Andy*, 182 Wn.2d 294, 301, 340 P.3d 840 (2014).

Not every interaction between the court, counsel, and defendants implicates the right to a public trial. *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012). Our Supreme Court has already established that certain proceedings implicate the public trial right; for other proceedings, we apply the "experience and logic" test announced in *Sublett* to determine whether a courtroom closure implicating the public trial right has occurred. 176 Wn.2d at 75-78. Under this test, the experience prong asks "'whether the place and process have historically been open to the press and general public,'" and "[t]he logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986)). If the answer to both prongs is yes, the public trial right attaches. *Sublett*, 176 Wn.2d at 73.

When the public trial right attaches, the trial court must consider the *Bone-Club* factors and make specific findings on the record justifying closure. *State v. Bone-Club*, 128 Wn.2d 254,

6

258-59, 906 P.2d 325 (1995). Violation of the right to a public trial is a structural error, so the remedy is reversal and remand for a new trial. *State v. Wise*, 176 Wn.2d 1, 15, 20, 288 P.3d 1113 (2012).

B.      *Private Selection of Alternate Juror Seats*

        1. *Implication of Public Trial Right*

        Gotcher argues that *State v. Jones*, 175 Wn. App. 87, 95, 303 P.3d 1084 (2013) establishes that the public trial right was implicated in the selection of blind alternate juror seats. We disagree.

        In *Jones*, a court staff member conducted a drawing to choose alternate jurors during an afternoon court recess, and notified Jones, counsel, and the jurors after it occurred. 175 Wn. App. at 102. Therefore, the selection of the alternates occurred off the record and outside the trial proceedings without a *Bone-Club* analysis. 175 Wn. App. at 102-03. We held that the procedure, which constituted an off-the-record selection of alternate *jurors*, violated Jones's right to a public trial, requiring a new trial. 175 Wn. App. at 102-03.

        The procedure in *Jones* differs from the procedure in Gotcher's trial in a significant way. In *Jones*, the selection of alternate jurors occurred after the jury was empaneled. *See* 175 Wn. App. at 102. The alternate jurors who were selected were among the empaneled jurors. But in Gotcher's case, counsel selected two *juror seat numbers* to serve as alternates. Counsel chose juror seats, rather than jurors, before voir dire began and before the jury venire had arrived in the courtroom. Because of this critical difference, *Jones* does not control our analysis of whether the

7

public trial right attached to the procedure in this case. We turn to the experience and logic test

to determine whether the public trial right attaches to the procedure in Gotcher's case.

2. *Experience and Logic: Public Trial Right Does Not Attach*

i. *Experience*

While it is true that the Washington experience of alternate juror selection has historically

been open to the press and public, *Jones*, 175 Wn. App at 101, the process used by the trial court

here, allowing trial counsel to choose an empty juror seat, is different. No alternate juror was

chosen during this process. Counsel merely chose juror seats numbers 8 and 10, and agreed that

the persons who would come to be seated thereon would be the alternate jurors. This is akin to

the procedure many trial courts employ: determining before the jury venire arrives in the

courtroom that juror seats numbers 13 and 14 will be the alternate juror seats. This procedural

determination, prior to any jury venire being brought into the courtroom, has not historically

been open to the press and public.

ii. *Logic*

Moreover, logic does not require the pre-voir dire selection of alternate juror seats to be

part of the public trial right. In *Jones*, we considered the purposes of the public trial right and

concluded that a public selection of alternate jurors was necessary to protect two interests: "basic

fairness to the defendant and reminding the trial court of the importance of its functions." 175

Wn. App. at 101-02. In *Jones*, the trial court had announced that it would select alternate jurors

randomly at the end of trial. 175 Wn. App. at 102. But the trial court instead allowed the court

staff member to select the alternates in private. 175 Wn. App. at 102. Because that procedure

8

did not adequately protect against the possibility of "manipulation or chicanery," we held that logic required the selection of alternate jurors to occur in open court. 175 Wn. App. at 102.

But as stated above, the procedure in Gotcher's trial was critically different from the procedure in Jones's trial. The procedure here was completely disconnected from any sitting jurors. It occurred before the jury venire arrived in the courtroom, and it involved counsel for both parties merely choosing a seat number. This was the selection of an empty seat, not an individual juror. This procedure does not involve the same risk of manipulation or chicanery as did the procedure used in *Jones*. It does not raise any serious questions about the overall fairness of the trial because we are assured by the timing of this procedure that the selection was truly random. Thus, we hold that logic does not require the pre-voir dire selection of alternate juror seats to occur in open court.

Both *Sublett* prongs are required to implicate the public trial right, and neither prong has been met here. 176 Wn.2d at 73. We hold that the public trial right was not implicated and Gotcher's argument fails.[7]

## II. SENTENCE

Gotcher argues that the trial court abused its discretion by failing to consider an exceptional sentence downward from the standard range. We disagree.

_____

[7] Because we hold that the public trial right does not attach to the pre-voir dire selection of alternate juror seats, Gotcher's claim fails. But we note also that, even if the public trial right attached to this procedure, Gotcher's claim would fail because he has failed on the record before us to carry his burden of demonstrating that the court was closed.

No. 46119-6-II;
Consolidate with No. 47142-6-II

A.      *Standard of Review*

Generally, the length of a sentence is not appealable so long as it falls within the correct standard sentencing range. *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). While a defendant may appeal the sentencing court's determination of the appropriate standard range, he may not challenge the court's discretionary imposition of a sentence that lies within that range. *Williams*, 149 Wn.2d at 146-47. "[S]o long as the sentence falls within the proper presumptive sentencing ranges set by the legislature, there can be no abuse of discretion as a matter of law as to the sentence's length." *Williams*, 149 Wn.2d at 146-47.

When a sentencing court declines to grant a downward departure from the standard range, appellate review is limited to circumstances where the trial court entirely refuses to exercise its discretion, or where it has relied on an impermissible basis for refusing to grant a downward departure. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). "A court refuses to exercise its discretion if it refuses categorically to impose an exceptional sentence below the standard range under any circumstances; i.e., it takes the position that it will never impose a sentence below the standard range." *Garcia-Martinez*, 88 Wn. App. at 330. The failure to consider a downward departure is reversible error. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). However, a trial court has exercised its discretion, and its decision is not reviewable, if it has "considered the facts and concluded there is no legal or factual basis for an exceptional sentence." *State v. McGill*, 112 Wn. App. 95, 100, 47 P.3d 173 (2002).

10

B.      *Standard Sentence Not Appealable*

Gotcher argues that the trial court refused to consider a downward departure, making his standard range sentence reviewable. We disagree: the trial court did consider a downward departure.

Gotcher mischaracterizes the record of sentencing. He argues, without citing the record, that "the court categorically denied to even consider an exceptional sentence downward because Gotcher denied guilt and put the prosecutor to the test to prove the charges against him." Br. of Appellant at 19. The record does not support these allegations. Instead, the record contradicts Gotcher's assertion that the trial court categorically refused to consider a downward departure. The record shows that the trial court reviewed the parties' briefing and supporting documentation and heard argument, then concluded that no legal basis had been established on which to impose an exceptional sentence below the standard range.

The trial court did not fail to exercise its discretion. Gotcher's standard range sentence is not reviewable.

III. STATEMENT OF ADDITIONAL GROUNDS

In his pro se SAG, Gotcher alleges two further errors: he claims that we should reverse the jury verdict because (1) AE's testimony was inconsistent regarding the offense dates, and (2) the trial court should not have admitted evidence of poems Gotcher wrote to AE. We disagree.

A.      *Victim's Testimony*

First, Gotcher urges us to reverse the jury verdict because "the charging dates and the dates given by [AE] in court do not match." SAG at 1. He contends that the State charged

incidents between June 1, 2010, and September 15, 2010, whereas AE stated that the incidents

occurred "in the summer before she turned 16 and that she was 15 years old at the time."[8]  SAG

at 1.  Because AE was born in July 1995, she turned 16 in July 2011.  AE was therefore 15 from

July 2010 until her birthday in July 2011; thus, the charging dates of June to September 2010

align with her testimony that Gotcher raped and molested her when she was 15 and in the

summer "before [she] turned 16."  2 VRP (Jan. 7, 2014) at 42.

Moreover, the persuasiveness, credibility, and weight of the evidence are matters for the

trier of fact and are not subject to review.  *See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d

850 (1990).  Thus, Gotcher's assertions about the dates AE provided do not support reversal of

his conviction.  Gotcher attacked AE's credibility at trial through his own testimony as well as

that of other witnesses.  The jury weighed these witnesses' credibility and determined the facts;

this determination is not subject to appellate review.

B.      *Poems*

Gotcher next asserts that the jury should not have heard evidence of poems Gotcher

wrote, which were found on the iPod.  First, Gotcher claims that the iPod evidence "was not

shared with the Defense Counsel until minutes before it was presented at trial."  SAG at 2.  Thus,

Gotcher asserts that he was not afforded time to prepare a defense to the evidence.  This claim

fails.  The record does not support the assertion that defense counsel had no opportunity to

---

[8] As stated above, the child molestation count's charging dates were July 26, 2009 through
October 31, 2010; the first child rape count's charging dates were July 26, 2009 through July 25,
2011; and the second child rape count's charging dates were June 1, 2010 through September 15,
2010.  At the outside, these dates span from AE's fourteenth birthday through the day before her
sixteenth birthday.

12

prepare a defense to the iPod evidence. When the State first moved to lay a foundation to admit the messages as exhibits, Gotcher's counsel stated, "I received copies of these in advance of trial." 2 VRP (Jan. 7, 2014) at 3. Thus, the record does not support Gotcher's assertion that this evidence was not timely disclosed.

Second, Gotcher argues that the poems were not properly authenticated, and may have been altered by the detective. We disagree: the iPod messages were properly authenticated, and Gotcher did not object to their admission as exhibits. Under ER 901(a), an item is authenticated if there is sufficient evidence to support a finding that the item is what the proponent claims it is. Here, AE and Detective Wallace testified to the chain of custody: AE testified that she received the iPod containing the messages from Gotcher, and Detective Wallace testified that he received the iPod from AE. This testimony supports a finding that the messages were written by Gotcher; thus, they were admissible under ER 901. Moreover, after the State laid a foundation for the admission of these messages during AE's and Detective Wallace's testimony, Gotcher said, "No objection" to their admission as exhibits. VRP (Jan. 8, 2014) at 47-50. Thus, this claim fails.

Third, Gotcher asserts that the iPod evidence supported the State's "lustful disposition" theory, but that because the poems were not written until nearly two years after the rapes, the poems were irrelevant to that theory. SAG at 2. But Gotcher never objected to the relevance of the poems; thus, this argument is not preserved for appeal, and we do not consider it. RAP 2.5.

No. 46119-6-II;
Consolidate with No. 47142-6-II

IV. PERSONAL RESTRAINT PETITION

Finally, in a PRP, Gotcher argues that the prosecutor wrongly withheld exculpatory *Brady*[9] evidence of a separate prosecution of another defendant for raping AE. Specifically, he argues that evidence of this other prosecution involved "[s]tatements . . . made by [AE] and her mother," which "call into question whether anything could have happened between her and I and conflict with statements they made in this case." PRP at 3. We disagree and we deny the petition.

A.      *PRP Principles*

A PRP is not a substitute for a direct appeal. *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 824, 650 P.2d 1103 (1982). Accordingly, there are limits on the use of a PRP to collaterally attack a conviction. *Hagler*, 97 Wn.2d at 824.

Because a defendant's rights to due process are implicated when the State suppresses exculpatory evidence, a *Brady* violation claim implicates constitutional rights. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). When considering constitutional arguments raised in a PRP, we must decide whether the petitioner can show that a constitutional error caused actual and substantial prejudice. *Hagler*, 97 Wn.2d at 826-27. If the petitioner fails to make a prima facie showing of actual and substantial prejudice caused by constitutional error, we deny the PRP. *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983).

_____

[9] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

14

No. 46119-6-II;
Consolidate with No. 47142-6-II

B.      *Failure To Disclose Separate Prosecution Was Not a* Brady *Violation*

The State violates a defendant's rights to due process when it suppresses evidence that is material to either guilt or punishment, regardless of whether the prosecutor acted in good faith. *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). To establish a *Brady* violation, the defendant must show that the State suppressed evidence favorable to the defendant and the suppression prejudiced the defendant. *Strickler*, 527 U.S. at 281-82. The State must disclose both impeaching and exculpatory evidence, and the prosecutor must disclose all favorable evidence known to either the prosecutor or the police. *Strickler*, 527 U.S. at 280-81. A defendant can show prejudice "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985)). "'A *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information' at issue." *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998) (quoting *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir.1994)).

Here, Gotcher's *Brady* claim fails. First, as evidenced by the transcript of the telephone call, Gotcher either actually obtained, or could have obtained, the information about the Gaiser incident. In the course of telling Gotcher she did not want to file a police report, AE said, "You know about like the whole Jacob Gaiser thing." Br. of Resp't (Attachment A at 1). This statement, in its context, demonstrates that Gotcher was aware, or through the course of reasonable diligence could have been aware, that AE had reported Gaiser's crime and that a

15

prosecution followed.  Despite this, Gotcher argues that "simply saying that I had heard about it is not enough since I did not know when it happened, the full name of the person who committed the crime or the details which could have put into question the alleged facts in my case."  Reply PRP at 1.  But Gotcher's phone call with AE shows that Gotcher had sufficient information about the Gaiser incident that Gotcher, exercising due diligence, could have obtained evidence of Gaiser's prosecution.  Therefore, the State's failure to disclose this information was not a *Brady* violation.  *Benn*, 134 Wn.2d at 916.

Second, Gotcher cannot show the required level of prejudice to establish a *Brady* violation.  He must show a reasonable probability that the outcome of his trial would have been different had the prosecution disclosed the evidence.  *Strickler*, 527 U.S. at 280.  He does not do so here: he shows merely that there is a possibility that he could have impeached AE's general story about her mood during the summer of 2010 with evidence that she was going through another traumatic experience at the time.  He does not show that evidence of Gaiser's rape of AE in any way made it less likely that Gotcher raped and molested her.  Thus, his claim fails.[10]

## CONCLUSION

In conclusion, we disagree with Gotcher's assignments of error and we deny his PRP.  He has failed to show a public trial violation or that the trial court abused its discretion by failing to consider a downward departure.  Nor did any evidentiary errors at trial require reversal.  Finally,

---

[10] Alternatively, even if Gotcher could establish a *Brady* violation, he cannot succeed in his PRP because he fails to make a prima facie case of actual and substantial prejudice resulting from the prosecutor's failure to disclose information about the Gaiser trial.  He merely speculates that being able to provide evidence of a prosecution relating to other traumatic events in AE's life around the time of the rapes in Gotcher's case would have altered the jury verdict.

No. 46119-6-II;
Consolidate with No. 47142-6-II

he has failed to show a *Brady* violation. We affirm his convictions and sentence and we deny his

PRP.

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Johanson, C.J.

_____
Maxa, J.